IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

QUALITY LABOR MANAGEMENT, LLC,

        Plaintiff,

vs.

SCOTT MULLEN, an individual, SK MULLEN CONSULTING, LLC, a foreign limited liability company

        Defendants.

_____

Case No. _____

**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF REQUESTED**

**DEMAND FOR A JURY TRIAL**

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u>

Plaintiff Quality Labor Management, LLC ("Quality Labor" or "Plaintiff"), by and through its undersigned counsel, hereby sues Defendants, Scott Mullen ("Mullen"), and SK Mullen Consulting, LLC ("SKM") (collectively referred to as the "Defendants"), and seeks temporary and permanent injunctive relief against Defendants. In support, Plaintiff states as follows:

## <u>NATURE OF THE ACTION</u>

This is an action against Quality Labor's former representatives, Mullen and his wholly-owned limited liability company, SKM, arising out of Defendants' active involvement with a direct competitor of Quality Labor, Defendants' breaches of several restrictive covenants, Defendants' misappropriation of Quality Labor's trade secrets and other confidential and proprietary information, and Defendants' tortious

interference with Quality Labor's well-established business relationships.    As a result, Quality Labor seeks to recover its damages and to enjoin Defendants from (a) competing with Quality Labor within the agreed upon restricted area during the agreed upon prescribed time period; (b) using or disclosing any of Quality Labor's business information, trade secrets or technological expertise that is not readily known or available to the public including client lists, employee lists, data, records, writing, techniques, methods, processes, or any other information, knowledge, or intelligence relating to any aspect of Quality Labor's business; (c) independently or cooperatively soliciting, inducing, or encouraging any current employees, contractors or affiliates of Quality Labor to terminate their employment/affiliation with Quality Labor; (d) contacting, soliciting, or accepting business from any actual or prospective clients of Quality Labor; and (e) otherwise tortiously interfering with Quality Labor's contractual and business relations.

## **PARTIES, JURISDICTION, AND VENUE**

1.      Quality Labor is a Florida limited liability company with its principal place of business located at 4035 W. 1st Street, Sanford, Florida. Each of Quality Labor's members reside in Florida.

2.      Mullen is an individual residing in Texas.

3.      SKM is a Texas limited liability company with its principal place of business located at 2220 Barlass Dr., Rockwall, Texas.   According to records maintained by the Texas Secretary of State, each of SKM's members reside in Texas.

2

4.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this dispute is between citizens of different states.  Complete diversity exists between Plaintiff and Defendants.  Further, the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

5.      This court also has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331 and the Federal Defend Trade Secrets Act ("FDTSA"), 18 U.S.C. § 1836(b)(1).  The FDTSA vests original jurisdiction in federal courts to decide civil cases involving misappropriation of trade secrets where, as here, "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  *See Grow Fin. Fed. Credit Union v. GTE Fed. Credit Union,* No. 8:17-CV-1239-T-30JSS, 2017 WL 3492707, at *3 (M.D. Fla. Aug. 15, 2017).

6.      This court has supplemental jurisdiction over Plaintiff's state law claims in accordance with 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal law claim that they form part of the same case and controversy.

7.      This court has personal jurisdiction over Defendants because Defendants submitted to the jurisdiction of the court by assenting to an agreement providing that all disputes shall be litigated in either Seminole County, Florida or in the federal court in the Middle District of Florida.  Further, the court has personal jurisdiction over Defendants because: (i) the agreement that is the subject of this action became binding and effective upon Defendants in Florida, (ii) Defendants directed their conduct toward the forum by providing Quality Labor with financial

statements in Florida, sending payment to Quality Labor in Florida, and submitting other documentation to Quality Labor in Florida; and (iii) Defendants caused injury to Quality Labor within the state of Florida while providing services to Quality Labor within the state of Florida.

8.      Moreover, Defendants availed themselves of the forum by traveling to Quality Labor's headquarters in Florida to attend, among other things, budgeting meetings, staff meetings, policy and procedure reviews, and company-wide holiday gatherings, between 2013 and 2020.  Mullen specifically travelled to Florida in or around 2013 to discuss and negotiate the terms of a contemplated agreement with Quality Labor.

9.      Venue is proper in this court pursuant to Section 21 of the Agreement, as defined herein.

## FACTUAL BACKGROUND

### A.      Quality Labor

10.      Founded in 2008, Quality Labor has developed a high-end, professional skilled service company that partners with clients from across the United States in need of skilled staff.  Quality Labor fulfills the needs of its clients, from various industries, by utilizing innovative software, trained staff and years of business acumen.

11.    Specifically, Quality Labor provides workforce management to its clients in a wide array of industries, including: construction, industrial, energy, stevedoring and telecommunications.

12.    Annually, Quality Labor conducts business with hundreds of clients located around the United States.  Quality Labor has a particularly well established business practice in Texas, servicing areas throughout the state via its offices located in Houston, Dallas and Austin since 2013.

13.    To serve its clients, Quality Labor employs thousands of skilled laborers (referred to by Quality Labor as "Team Members"), annually.

14.    In its more than 13 years of operation, Quality Labor invested significant monetary and other resources to develop, among other things, its confidential and proprietary pricing, business know-how, client lists, and Team Member lists.

15.    Specifically, Quality Labor has developed valuable, proprietary databases of information documenting important, non-public information regarding its clients, employees, and Team Members.  Quality Labor stores this information, along with its other confidential business information, on its electronic servers, which can only be accessed with a Quality Labor log-in and password.

16.    Quality Labor provides certain of its employees with individual credentials to access Quality Labor's servers.  Access is limited based upon region—

5

meaning that only employees working in Texas have access to information related to Texas business operations.

17.     As stated, Quality Labor maintains a comprehensive client list for each region in which Quality Labor operates.  Quality Labor's client list contains confidential and proprietary information that is not readily available to the public. For example, Quality Labor's client list includes the bill rate and pay rate that each client is willing to pay for a given job.  Further, Quality Labor's client list includes the contact information (name and direct phone number, often including a cell phone number) for the primary decision-maker of each client.  Lastly, Quality Labor's client list includes notes describing Quality Labor's intel on each of its client's businesses and preferences, as acquired through Quality Labor's several years of experience working with a given client.

18.     Quality Labor also maintains a comprehensive list of its Team Members.  This list includes detailed, nonpublic information on each of Quality Labor's Team Members that Quality Labor has acquired over its years of employing said Team Members.   Specifically, the list includes names, contact information (including direct cell phone numbers), job rate, pay rate, job site address, job site supervision, list of skills, E-Verify information and drug test results for each Team Member.  Most importantly, the Team Member list includes notes regarding any given Team Member's history—such as, whether a specific client approved or disapproved of the specific Team Member's work.

19.    Quality Labor's Texas-based client list and Team Member list are stored in Microsoft Excel spreadsheets on Quality Labor's electronic server, and they can only by employees with log-in credentials.  Moreover, each region is able to view the confidential information described above that is applicable to that region. Because Defendants served as the Area Representative throughout Texas, Defendants had full access to Quality Labor's confidential information relating to Texas.

20.    Quality Labor exercises reasonable measures to ensure the continuing confidentiality of its trade secrets and confidential information.  To that end, Quality Labor utilizes non-disclosure, non-competition, and non-solicitation agreements, which are necessary and reasonable to protect its legitimate business interests.

21.    Each member of Quality Labor's professional staff is required to sign a non-disclosure agreement as a prerequisite to employment with Quality Labor.  In other words, each employee with access to Quality Labor's server signed a non-disclosure agreement.

22.    As a further condition of employment with Quality Labor, each employee, independent contractor and/or Team Member is required to sign an Employee Handbook Acknowledgement and Receipt form, acknowledging that it is the employee/contractor's responsibility to read and comply with the policies contained in the handbook and any revisions thereto.

23.     The Employee Handbook directs Quality Labor's workers to maintain the confidentiality of all information relating to Quality Labor's clients and their businesses and not to disclose such information to external parties or even to other employees without a "need to know."

24.     Each year, Quality Labor spends hundreds of thousands of dollars on travel and expenses of officers, sales personnel, and other employees in support of establishing and maintaining goodwill with its clients.  For example, in 2020 alone, Quality Labor spent over $600,000 reimbursing operations, travel and other expenses incurred by Texas representatives in connection with Quality Labor business.

25.     Quality Labor's trade secrets are utilized not only in Texas, but across the United States in furtherance of Quality Labor's business operations.

**B.     The Area Representative Agreement**

26.     To best serve its clientele, Quality Labor appoints an "area representative" to manage certain regions where Quality Labor operates.

27.     Before 2013, Quality Labor serviced clients in Texas, but did not have a physical office in Texas.  Quality Labor recognized the need for expansion to better service its already established client relationships.

28.     In February of 2013, in an effort to strengthen its presence in Texas, Quality Labor entered into an Area Representative Agreement with Mullen, appointing Mullen as an Area Representative for Quality Labor throughout the State

of Texas.[1]  Mullen's duties included, but were not limited to, recruiting members to Quality Labor's staff, soliciting clients, accepting and filling clients' orders, and assigning said staff on Quality Labor's behalf only under the designated service name of Quality Labor and no other name unless otherwise specifically directed in writing by Quality Labor.

29.     The 2013 Agreement was subsequently updated on December 16, 2015 (hereinafter, the "Agreement").[2]  Pursuant to the Agreement, Mullen and SKM became the collective Area Representative for Texas.

30.     Defendants expressly agreed that during the term of the Agreement and for a period of twenty-four (24) months from the date of termination of the Agreement, they would not reproduce, remove, nor disclose Quality Labor's business information, trade secrets, or technological expertise (the "Confidential Information").  Ex. A, § 12(e).  The Confidential Information expressly includes, but is not limited to, client contact information, trade secrets, customer lists, vendor lists, identity of any customer, data, records, writing, techniques, methods, processes, know-how, computer software programs, or any other information, knowledge, or intelligence relating to any aspect of Quality Labor's business.  *Id.*

---

[1] A true and correct copy of the 2013 Area Representative Agreement is attached hereto as **Exhibit A.**

[2] A true and correct copy of the December 16, 2015 update is attached hereto as **Exhibit B.**

31.     Defendants further agreed that for a period of twenty-four (24) months from the date of termination of the Agreement, neither Defendants nor their agents, employees, managers and/or other affiliates would, directly or indirectly, own, operate, manage, join, control, participate in the ownership, management, operation, or control of, or be paid or employed by, or otherwise be associated with an entity or person engaged in a business similar to or in any way in competition with Quality Labor's business in the State of Texas.  Ex. A, § 12(f).

32.     Pursuant to the Agreement, Quality Labor advanced 100% of the start-up costs for Quality Labor's Texas operation.  In accordance with the Agreement, Defendants assembled professional staff to aid in managing Quality Labor's Texas branch.  Defendants hired Jessica Galvan ("Galvan") as operations manager and lead recruiter.  Defendants added Mullen's wife, sister and father to the staff, as well.  In 2014, Defendants also hired Mullen's brother—Steven Mullen ("Steve Mullen")—to manage sales for Quality Labor's Houston office.

33.     Between 2013 and 2020, Defendants utilized Quality Labor's resources and aided in growing Quality Labor's presence in Texas.   Defendants were successful in this endeavor.  By the end of 2019, Quality Labor earned almost $13 million in revenue from its Texas operations, alone.

## C.     Defendants' Violations of the Agreement

34.     Despite Quality Labor's solid performance in Texas in previous years, the company experienced a down year in 2020.  When asked why Quality Labor's

10

performance had dipped so dramatically in Texas during 2020, Mullen cited the COVID-19 pandemic.

35.     On February 23, 2021, Quality Labor received a phone call from a Texas client inquiring about the status of two injured employees at a location in Dallas, Texas.  When Quality Labor advised the client that it did not possess any record of having placed employees at their location, the client informed Quality Labor that the employees were placed through "Scott's new company."

36.     On February 24, 2021, Quality Labor notified Defendants that they were suspended pending an investigation into Mullen's business activities.  Quality Labor advised Defendants that they were not permitted to access or attempt to access Quality Labor's systems or infrastructure during his suspension.

37.     On February 25, 2021, only a day after being suspended and without Quality Labor's permission, Mullen apparently entered and cleaned out Quality Labor's Texas office after normal working hours, taking with him his company phone, laptop, and other equipment issued and paid for by Quality Labor.

38.     The next day, Quality Labor advised a number of employees via email that Defendants were no longer with Quality Labor.  On the evening of February 26, 2021, Mullen posted on his personal Facebook account that "[w]e need 100 people

for water abatement and demolition of residential and commercial properties. Pay starts at $16 an hour.  Work starts tomorrow morning[.]"[3]

39.    Quality Labor's investigation revealed that Defendants, in violation of the express terms of the Agreement, had been diverting business to Scale and Change LLC and/or Scale and Change Management LLC (together, "Scale and Change") while still employed, and being compensated, by Quality Labor.

40.    On March 1, 2021, Quality Labor emailed Mullen and advised him that its President and Chief Executive Officer, Mark Lang ("Lang"), wished to meet with him regarding the findings of Quality Labor's investigation.  Later that day, Mullen responded and advised that he would not attend the meeting.  That same day, Mullen's brother resigned from Quality Labor.

**D.    Scale and Change, Myrick, and Mullen**

41.    Scale and Change is operated by Michael Chase Myrick ("Myrick"). Upon information and belief, Myrick and Mullen are close friends, vacation together, and lived next door to one another for four years.

42.    According to filings with the Texas Secretary of State, on October 21, 2019 and January 14, 2021, Myrick incorporated Scale and Change LLC and Scale

---

[3] A true and correct copy of Mullen's February 26, 2021, Facebook post is attached hereto as **Exhibit C.**

and Change Management LLC, respectively.[4]  According to his LinkedIn profile, Myrick works as a Strategic Sourcing Manager for Ericsson, the cellphone manufacturer, and upon information and belief has limited, if any, experience in the staffing industry.[5]

43.    According to Scale and Change's website (https://scaleandchange.com/), the company provides construction staffing and services, such as electricians, plumbers, pipe-fitters, carpenters, and welders—the exact services that Quality Labor provides.   Scale and Change touts itself as possessing over 30 years of combined experience in staffing.[6]

44.    Although Quality Labor's investigation into the extent of Defendants' wrongdoing is ongoing, Quality Labor has uncovered significant evidence establishing that the Defendants, with the help of Galvan and Steve Mullen, wrongfully misappropriated Quality Labor's trade secrets, company information and resources in order to further a competing venture—Scale and Change.

45.    Quality Labor uncovered emails sent from Quality Labor's long-time client to Defendants on their Quality Labor email address.   The client told

---

[4] A true and correct copy of Scale and Change LLC's Certificate of Formation and Scale and Change Management LLC's Certificate of Formation are attached hereto as **Composite Exhibit D.**

[5] A true and correct copy of Myrick's LinkedIn profile, as it appeared on March 17, 2021, is attached hereto as **Exhibit E.**

[6] A true and correct copy of Scale and Change's website, as it appeared on March 8, 2021, is attached hereto as **Exhibit F.**

Defendants that it was in need of two Team Members for a project.  Defendants responded stating they would "take care of it."  However, Quality Labor's records are devoid of any indication that Quality Labor's Team Members were actually placed with the client in response to this request.  Upon information and belief, Defendants staffed this request with two employees of Scale and Change.

46.    From March 2, 2021 through March 4, 2021, Lang met with Quality Labor's largest Texas clients.  Three clients confirmed Defendants' relationship with Scale and Change and stated that, upon the advice of Defendants, they had transferred their business from Quality Labor to Scale and Change.  The first client stated that in October of 2020, Mullen represented himself as the owner of Scale and Change in order to obtain the client's business for the new company.  The first client further advised, in the presence of two other Quality Labor employees, that the client knew of two email addresses for Mullen—one associated with Quality Labor and one associated with Scale and Change—and that the client had accidentally addressed the aforementioned email requesting two Team Members to Mullen's Quality Labor address.   The second client advised that Mullen represented to it in January of 2021 that he had left Quality Labor to start a new company, Scale and Change.  The last customer told Lang that as early as September of 2020, Mullen and a former employee of Quality Labor, who Mullen supervised, represented that Quality Labor was now Scale and Change.

47.     Quality Labor also discovered a draft email dated January 29, 2021, contained in Galvan's deleted email file that attached a prospective employee's application to Scale and Change.  The applicant identified is a current Quality Labor Team Member.

48.     Galvan also staffed current Quality Labor Team Members on projects maintained by Scale and Change, without the Team Members' knowledge. Specifically, on March 9, 2021, a Quality Labor employee interviewed a prior Quality Labor Team Member, Baldemar Valencia Arteaga ("Arteaga").[7]   Arteaga stated that in November of 2020, Galvan placed Arteaga at a job site maintained by Scale and Change, while representing to Arteaga that Quality Labor was now Scale and Change.  Hager Decl., ¶8(a)-(i).

49.     Steve Mullen similarly diverted prospective and actual Team Members from Quality Labor to Scale and Change.  On that point, Quality Labor uncovered emails dated September 9, 2020, sent from Steve Mullen's Quality Labor email address inviting the recipient to fill out Scale and Change employment applications. In the emails, Steve Mullen edited his signature block to state that he was the "Chief of Operations" for "Construction Staffing & Services LLC."   Further, Steve

---

[7] *See* Affidavit of Ross Hager ("Hager Decl."), filed contemporaneously herewith, in support of Plaintiff's Motion for Temporary Injunction.

Mullen's   email   signature   also   boldly   included   the   following   image:

**SCALE & CHANGE** ‹‹‹

50.     Steve Mullen also attempted to persuade Quality Labor's clients to stop doing business with Quality Labor and instead move their business to Scale and Change.  In February of 2021, one of Quality Labor's largest Texas clients advised that it received a telephone call from Steve Mullen, who attempted to convince the client to move its business from Quality Labor to "his brother's company."  Hager Decl., ¶7.

51.     Together, Scott Mullen, Steve Mullen and Galvan utilized Quality Labor's Confidential Information on behalf of Scale and Change.

52.     The activities outlined herein constitute direct and unfair competition with Quality Labor and use of Quality Labor's trade secrets, goodwill and Confidential Information in direct violation of the Agreements executed while under Quality Labor's employ.

53.     All conditions precedent to the filing and maintenance of this action have been performed, waived or excused.

54.     Plaintiff has retained the law firm of Foley & Lardner, LLP in this matter and is obligated to pay a reasonable fee for its services.

## Count I – Breach of Covenant Not to Compete

55.    Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1 through 54 above.

56.    Defendants entered into the Agreement with Quality Labor.

57.    Section 12(f) of the Agreement contains a non-competition provision that prohibits Defendants (along with their agents, employees, affiliates, etc.) from performing any work competitive with Quality Labor in Texas for a period of two years following termination of the Agreement.

58.    On March 31, 2021, Quality Labor sent a termination letter to Defendants pursuant to Section 9 of the Agreement.[8]   Thus, the Agreement terminated on March 31, 2021.

59.    The non-competition provision is necessary to protect and maintain Plaintiff's legitimate business interests, including but not limited to: (i) its trade secrets, (ii) its valuable and confidential business information, (iii) its substantial relationships with specific prospective or existing clients, and (iv) its goodwill associated with the Quality Labor name throughout the state of Texas.

60.    Defendants acknowledged the necessity of the non-competition provision in the Agreement.  Ex. A, § 12(f) ("Area Representative acknowledges

---

[8] A true and correct copy of the March 31, 2021 Termination Letter is attached hereto as **Exhibit G**.

and agrees that the foregoing provisions of this Section 12(f) are reasonable and necessary for the protection of Quality Labor and its legitimate business interests and that Quality Labor will be irrevocably harmed if same are not specifically enforced, and accordingly, the foregoing restrictive covenants may be enforced by Quality Labor by means of a preliminary or permanent injunction, without prejudice to such damage rights as may exist.").

61.     The two-year restriction in the non-competition provision prohibiting Defendants from performing any work competitive with Plaintiff is reasonable to protect Plaintiff's legitimate business interests given the damage that can be done to Quality Labor, and the damage Defendants have already caused to Quality Labor, if Defendants are permitted to compete with Quality Labor.  Further, the geographic scope in the non-competition provision is reasonable in that it encompasses only the geographic territory in which Defendants worked for Quality Labor.

62.     Defendants breached the non-competition provision by working for (and upon information and belief, personally forming and creating) the Scale and Change entities—direct competitors of Quality Labor.

63.     Defendants' breaches of the non-competition provision have caused and continue to cause Plaintiff irreparable harm in the form of, among other things, loss of customers and goodwill.

64.     Accordingly, Plaintiff lacks an adequate remedy at law, and the interest of the public will be well-served by the entry of an injunction.

65.     Further, as a result of Defendants' acts and omissions, Plaintiff is entitled to recover its damages, to the extent ascertainable.

66.     Pursuant to Section 542.335(1)(k), Fla. Stat., Plaintiff is entitled to recover the fees it incurs in prosecuting this action.

67.     Pursuant to Section 542.335(1)(j), Fla. Stat., Plaintiff is entitled to an immediate injunction restraining the Defendants' breaches of the non-competition provision.

WHEREFORE, Plaintiff seeks a judgment against Defendants for all ascertainable damages and interest, and respectfully requests entry of a temporary and permanent injunction enjoining Defendants from violating the non-competition provision, awarding Plaintiff its attorneys' fees and costs incurred in prosecuting this action pursuant to Section 542.335(1)(k), Fla. Stat., and requests such further relief as this Court deems just and proper.

## Count II – Breach of Covenant Not to Disclose or Use Confidential Information

68.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

69.     Defendants entered into the Agreement with Quality Labor.

70.     Section 12(e) of the Agreement contains a confidentiality provision, prohibiting the disclosure of Confidential Information to anyone other than Plaintiff

during the term of the Agreement and for a period of two years following termination of the Agreement.

71.     On March 31, 2021, Quality Labor sent a termination letter to Defendants pursuant to Section 9 of the Agreement. *See* Ex. G. Thus, the Agreement terminated on March 31, 2021.

72.     The confidentiality provision is necessary to protect and maintain Plaintiff's legitimate business interests, including but not limited to: (i) its trade secrets, (ii) its valuable and confidential business information, (iii) its substantial relationships with specific prospective or existing clients, and (iv) its goodwill associated with the Quality Labor name throughout the state of Texas.

73.     The two-year restriction on the use and disclosure of Plaintiff's trade secrets and confidential information is reasonable to protect Plaintiff's legitimate business interests given the damage that can be done to Quality Labor, and the damage Defendants have already caused to Quality Labor, if the information falls into the hands of a competitor.

74.     Defendants' actions during the term of the Agreement constitute an actual, and a threatened, breach of the confidentiality provision as they are now in a position to, and already have, used and disclosed Plaintiff's trade secrets and Confidential Information to the detriment of Quality Labor.

75.     Defendants' breach, and threatened breach, of the confidentiality provision has caused and will cause Plaintiff irreparable harm in the form of, among other things, loss of customers and goodwill.

76.     Plaintiff lacks an adequate remedy at law, and the interest of the public will be well-served by the entry of an injunction.

77.     Pursuant to Section 542.335(1)(k), Fla. Stat., Plaintiff is entitled to recover the fees it incurs in prosecuting this action.

78.     Pursuant to Section 542.335(1)(j), Fla. Stat., Plaintiff is entitled to an immediate injunction restraining Defendants' actual and threatened breach of the confidentiality provision.

79.     Further, as a result of Defendants' acts and omissions, Plaintiff is entitled to recover its damages, to the extent ascertainable.

WHEREFORE, Plaintiff seeks a judgment against Defendants for all ascertainable damages and interest, and respectfully requests entry of a temporary and permanent injunction enjoining Defendants from violating the confidentiality provision, awarding Plaintiff its attorneys' fees and costs incurred in prosecuting this action pursuant to Section 542.335(1)(k), Fla. Stat., and requests such further relief as this Court deems just and proper.

## Count III – Breach of the Agreement

80.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

81.    Defendants entered into the Agreement with Quality Labor.

82.    Pursuant to Section 1 of the Agreement, Defendants agreed to (a) provide the prescribed business services under certain trademarks and trade names utilized by Quality Labor in accordance with the fundamental policies, procedures, techniques, systems and directives of Quality Labor, now in effect or hereinafter established; and (b) provide and sell quality services by Area Representative at competitive prices to the clients of Quality Labor in accordance with such policies, procedures, techniques, systems and directives of Quality Labor and the continued promotion of the goodwill associated with the trade names and trademarks of Quality Labor.

83.    Pursuant to Section 5(a) of the Agreement, Defendants agreed to "[d]evote full time and employ such resources as are necessary to achieve, maintain and surpass, if possible, the standards of sales performance contemplated by Section 11 hereof; develop to the greatest possible degree all of the business services contemplated hereunder in the name of Quality Labor and on its behalf."

84.    Defendants breached Sections 1 and 5(a) of the Agreement by marketing and selling services under a different trade name, thereby harming Quality Labor's goodwill.  Specifically, Defendants utilized Quality Labor's time, resources, employees, agents and information to create and/or operate a competing business while still employed by Quality Labor.

85.     Quality Labor has been damaged as a result of Defendants' breaches of the Agreement.

WHEREFORE, Plaintiff seeks a judgment against Defendants for all damages, interest and such further relief as this Court deems just and proper.

<u>**Count IV – Tortious Interference with Business Relationships**</u>

86.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

87.     A business relationship exists between Plaintiff and its various clients, agents, workers, contractors and employees.

88.     Defendants have knowledge of the business relationships between Plaintiff and its various clients, agents, workers, contractors and employees.

89.     Defendants intentionally and unjustifiably interfered with Plaintiff's business relationships with its various clients, agents, workers, contractors and employees by using Plaintiff's Confidential Information to contact and solicit Plaintiff's clients, employees and Team Members on behalf of Scale and Change.

90.     Defendants lack any justification or privilege for interfering with Plaintiff's business relationships.

91.     Plaintiff has suffered, and will continue to, suffer damages as a direct and proximate result of Defendant's interference with its business relationships.

92.     As a result of Defendants' acts and omissions, Plaintiff is entitled to recover its damages, to the extent ascertainable.

93.    Further, Defendants' actual tortious interference and threatened tortious interference has caused and will cause Plaintiff irreparable harm in the form of, among other things, loss of customers and goodwill.

94.    Plaintiff lacks an adequate remedy at law, and the interest of the public will be well-served by the entry of an injunction.

WHEREFORE, Plaintiff seeks entry of a judgment against Defendants for intentional interference with its business relationships awarding all ascertainable damages and interest, and respectfully requests entry of preliminary and permanent injunctive relief enjoining Defendants from tortiously interfering with Plaintiff's contractual and business relations, and requests such further relief as this Court deems just and proper.

## Count V – Violation of the Defend Trade Secrets Act

95.    Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

96.    This is a claim by Plaintiff against Defendants for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq*. and, in particular for violation of 18 U.S.C. § 1836(b).

97.    The Confidential Information stored in Plaintiff's servers and accessed by Defendants, including Quality Labor's client list and Team Member list, constitute trade secrets in that they: (a) derive independent economic value from not being generally known to the public or to other persons who can obtain economic

value from its disclosure or use; and (b) have been the subject of reasonable efforts to maintain their secrecy.

98.    Defendants were fully aware of the confidential and trade secret nature of the Confidential Information contained in the Quality Labor's databases, including Quality Labor's client list and Team Member list, pricing, and other proprietary information.

99.    Pursuant to the Agreement and common law, Defendants had a duty to maintain the secrecy of Quality Labor's trade secrets.

100.    Defendants subsequently used Quality Labor's trade secrets for their own benefit and the benefit of a third party. Upon information and belief, Defendants did so to further Scale and Change's business in Texas and in other states across the United States.

101.    Defendants' improper access and subsequent use of Plaintiff's trade secret information was deliberate and intentional.

102.    Defendants' deliberate and intentional actions in: (a) improperly accessing Plaintiff's trade secret information, and/or (b) using Plaintiff's trade secret information constitute trade secret misappropriation.

103.    Defendants' actions are the direct and proximate cause of damages to Plaintiff.

104.  As a direct and proximate cause of Defendants' trade secret misappropriation, Defendants have been unjustly enriched in an amount no less than the amount of business lost by Plaintiff.

105.  Defendants have engaged in willful and malicious misappropriation and by reason thereof, Plaintiff is entitled to twice the amount of its actual damages and/or the amounts by which Defendants have been unjustly enriched as exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

106.  Further, Defendants' trade secret misappropriation has caused and will cause Plaintiff irreparable harm in the form of, among other things, loss of customers and goodwill.

107.  Plaintiff lacks an adequate remedy at law, and the interest of the public will be well-served by the entry of an injunction.

108.  Defendants have irreparably injured Plaintiff, and such injury will continue unless enjoined by this Court.

109.  As a result of Defendants' acts and omissions, Plaintiff is entitled to recover damages to the extent they can be ascertained.

110.  Because Defendants willfully and maliciously misappropriated its trade secrets, Plaintiff is also entitled to its attorney's fees, pursuant to 18 U.S.C. 1826(b)(3)(D).

111.   Plaintiff seeks temporary and permanent injunctive relief, pursuant to 18 U.S.C. § 1836(b)(3)(A), to prevent further misappropriation of its Confidential Information.

WHEREFORE, Plaintiff seeks a judgment against the Defendants awarding all ascertainable damages and interest, exemplary damages, along with attorneys' fees and costs incurred in prosecuting this action.  Plaintiff also respectfully requests entry of a temporary and permanent injunction enjoining Defendants from using any of Plaintiff's misappropriated trade secrets, compelling the return of any retained Quality Labor documentation that would constitute a trade secret, and requests such further relief as this Court deems just and proper.

### Count VI – Violation of the Florida Uniform Trade Secret Act

112.   Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

113.   This is a claim by Plaintiff against Defendants for violation of Florida's Uniform Trade Secrets Act Fl. Stat. § 688, *et seq*. and, in particular for violation of § 688.002.

114.   The Confidential Information stored in Plaintiff's servers and accessed by Defendants, including Quality Labor's client list and Team Member list, constitute trade secrets in that they: (a) constitute information that derives independent economic value from not being generally known to the public or to

other persons who can obtain economic value from its disclosure or use; and (b) have been the subject of reasonable efforts to maintain their secrecy.

115.   Defendants were fully aware of the confidential and trade secret nature of the Confidential Information contained in the Quality Labor's databases, including Quality Labor's client list and Team Member list, pricing, and other proprietary information.

116.   Pursuant to the Agreement and common law, Defendants had a duty to maintain the secrecy of Quality Labor's trade secrets.

117.   Defendants' deliberate and intentional actions in: (a) improperly accessing Plaintiff's trade secret information, and/or (b) using Plaintiff's trade secret information constitute trade secret misappropriation.

118.   Defendants' actions are the direct and proximate cause of damages to Plaintiff.

119.   As a direct and proximate cause of Defendants' trade secret misappropriation, Defendants have been unjustly enriched in an amount no less than the amount of business lost by Plaintiff.

120.   Further, Defendants' trade secret misappropriation has caused and will cause Plaintiff irreparable harm in the form of, among other things, loss of customers and goodwill.

121.   Plaintiff lacks an adequate remedy at law, and the interest of the public will be well-served by the entry of an injunction.

122.   As a result of Defendants' acts and omissions, Plaintiff is entitled to recover its damages, to the extent ascertainable.

123.   Plaintiff seeks temporary and permanent injunctive relief, pursuant to section 688.003, Fla. Stat.

124.   Because Defendants willfully and maliciously misappropriated its trade secrets, Plaintiff is also entitled to exemplary damages, pursuant to section 688.004, Fla. Stat.

125.   Because Defendants willfully and maliciously misappropriated its trade secrets, Plaintiff is also entitled to its attorneys' fees, pursuant to section 688.005, Fla. Stat.

WHEREFORE, Plaintiff seeks a judgment against the Defendants awarding all ascertainable damages and interest, exemplary damages, along with attorneys' fees and costs incurred in prosecuting this action.  Plaintiff also respectfully requests entry of a temporary and permanent injunction enjoining Defendants from using any of Plaintiff's misappropriated trade secrets, compelling the return of any retained Quality Labor documentation that would constitute a trade secret, and requests such further relief as this Court deems just and proper.

## Count VII – Breach of Fiduciary Duties

126.   Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

127.   Pursuant to the Agreement, Defendants served Quality Labor as its Area Representative.

128.   In this role, Defendant Mullen served as an employee, drawing a fixed salary, as evidenced by W-2 statements issued to Mullen.

129.   Defendant SKM, on the other hand, served as a independent contract, as evidenced by 1099 statements issued to SKM.

130.   Quality Labor exercised a substantial degree of control over Defendants.  For example, Quality Labor dictated the scope of Defendants duties and required that Defendants act in accordance with Quality Labor's policies and procedures.  *See generally*, Agreement, §5.  By way of further example, Quality Labor also required Defendants to supply Quality Labor with all necessary information to allow Quality Labor to maintain its customer lists.

131.   While in Plaintiff's employ as either employee or independent contractor, Defendants owed their principal (Quality Labor), the basic obligations of agency: among them, the duty of loyalty and obedience.

132.   To that end, Defendants were required to act on behalf of and in the best interests of Quality Labor. Specifically, pursuant to the Agreement, Defendants agreed to develop to the greatest possible degree, all of the business services contemplated in the name of Quality Labor and on its behalf.

133.   Defendants breached the duties of loyalty and obedience by, among other things, competing with Quality Labor, misappropriating Quality Labor's trade

secrets and Confidential Information for the benefit of themselves and third parties, utilizing Quality Labor's employees to further Defendants' own interests, seeking and obtaining reimbursement from Quality Labor for non-business related purchases, and diverting clients and employees away from Quality Labor—all while continuing to accept compensation from Quality Labor.

134.   As a result of these breaches, Plaintiff has suffered irreparable harm and damage.

135.   As a result of Defendants' acts and omissions, Plaintiff is entitled to recover its damages to the extent ascertainable.

136.   Further, Defendants' actual and threatened breaches have caused and will cause Plaintiff irreparable harm in the form of, among other things, loss of customers and goodwill.

137.   Plaintiff lacks an adequate remedy at law, and the interest of the public will be well-served by the entry of an injunction.

WHEREFORE, Plaintiff seeks entry of a judgment against Defendants for breach of fiduciary duties, awarding all ascertainable damages and interest, and respectfully requests entry of preliminary and permanent injunctive relief enjoining Defendants from further breaches, and requests such further relief as this Court deems just and proper.

## **Count VIII – Conversion**

138.   Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

139.   While still in the employ of Quality Labor, Defendants misappropriated Quality Labor's client lists, employee lists and other Confidential Information.

140.   Accordingly, Defendants wrongfully asserted dominion over Quality Labor's property—namely, Quality Labor's client lists, employee lists and other Confidential Information.

141.   Defendants' actions were inconsistent with Quality Labor's ownership of its client lists, employee lists and other Confidential Information.

142.   As a result of Defendants' conduct, Plaintiff has been damaged.

WHEREFORE, Plaintiff seeks entry of a judgment against Defendants for conversion, awarding all damages and interest, together with such other and further relief as this Court deems appropriate.

## **Count IX – Unjust Enrichment**

143.   Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 54 above.

144.   This count is pled in the alternative to Counts I-III.

145.   Quality Labor conferred a benefit on Defendants in the form of salary and commission.

146.   Defendants voluntarily accepted payment and retained this benefit while failing to perform their duties for Quality Labor.

147.   Defendants have been unjustly enriched to the extent they were compensated for services by Quality Labor that were not performed for the benefit of Quality Labor.

148.   Based on Quality Labor's investigation, to date, Defendants have retained at least $29,000 in salary (not including commission and other expenses) while working for the benefit of Defendants, Scale and Change and/or Myrick—not Quality Labor.

149.   Equity requires that Defendants remit this amount to Quality Labor.

WHEREFORE, Plaintiff seeks a judgment in its favor and against Defendants for unjust enrichment, awarding damages, costs, and interest, together with any such other and further relief deemed appropriate by the Court.

## Count X – Civil Conspiracy

150.   Plaintiff realleges and incorporates all preceding allegations set forth above.

151.   Defendants conspired with Galvan and Steve Mullen to commit the unlawful acts described in Counts I-IX, above.

152.   Defendants engaged in several overt acts in furtherance of the conspiracy—including without limitation, by participating in the creation and business operations of Scale and Change while employed by Quality Labor and

thereafter, utilizing Quality Labor's confidential and propriety information, and staffing Scale and Change's projects with Quality Labor's employees.

153.   As a result of acts performed in pursuit of the conspiracy, Plaintiff has been damaged.

WHEREFORE, Plaintiff seeks entry of a judgment against Defendants for civil conspiracy, awarding all damages and interest, together with such other and further relief as this Court deems appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for all issues triable by jury.

Dated: April 1, 2021

*/s/ Michael Gay*

**Michael Gay**
Florida Bar No:  938191
Primary Email:  mgay@foley.com
Secondary Email: sscott@foley.com
**Emily J. Lang**
Florida Bar No:  1011367
Primary Email:  elang@foley.com
Secondary Email:  kwarren@foley.com
**FOLEY & LARDNER LLP**
111 N. Orange Avenue, Suite 1800
Orlando, Florida 32801-2386
Telephone: 407-423-7656
Facsimile: 407-648-1743

*Counsel for Quality Labor*
*Management, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

QUALITY LABOR MANAGEMENT,
LLC,

       Plaintiff,

vs.

SCOTT MULLEN, an individual, SK
MULLEN CONSULTING, LLC, a
foreign limited liability company

       Defendants.

_____

Case No. _____

**PRELIMINARY AND
PERMANENT INJUNCTIVE
RELIEF REQUESTED**

**DEMAND FOR A JURY
TRIAL**

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746 and under penalties of perjury, the undersigned states that I have read the foregoing Verified Complaint filed in this action. The factual allegations contained therein are true and correct, except as to matters stated on information and belief, and as to such matters I state that I verily believe the same to be true to the best of my knowledge, information and belief.

QUALITY LABOR MANAGEMENT, LLC

By: _____

Mark Lang, Sr., President and Chief Executive Officer of the Plaintiff, Quality Labor Management, LLC (as to all paragraphs)

Executed on: March <u>31</u>, 2021

4833-6814-7938.1